Edward R. MYERS, individually and as guardian of minor children, Plaintiff–Appellant,

v.

LOUDOUN COUNTY PUBLIC SCHOOLS; Commonwealth of Virginia, Defendants–Appellees,

and

United States of America, Intervenor–Appellee,

and

Edgar B. Hatrick, Superintendent, Defendant.

State of Alabama; State of Alaska; State of Arkansas; State of Colorado; State of Delaware; State of Florida; State of Georgia; State of Hawaii; State of Idaho; State of Illinois; State of Indiana; State of Kansas; State of Kentucky; State of Maryland; State of Mississippi; State of Montana; State of Nevada; State of North Carolina; State of North Dakota; State of Ohio; State of Oklahoma; State of Oregon; State of Pennsylvania; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of Washington; State of Wyoming, Amici Supporting Appellee.

No. 03–1364.

United States Court of Appeals, Fourth Circuit.

Argued March 18, 2005.

Decided Aug. 10, 2005.

**ARGUED:** David H. Remes, Covington & Burling, Washington, D.C., for Appellant. Charles Lyman Becker, Reed Smith, L.L.P., Philadelphia, Pennsylvania; Maureen Riley Matsen, Deputy Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellees. Robert Mark Loeb, United States Department of Justice, Civil Division, Appellate Staff, Washington, D.C., for Intervenor, the United States. **ON BRIEF:** Andrew A. Ruffino, Christine I. Magdo, Covington & Burling, New York, New York, for Appellant. E. William Chapman, Reed Smith, L.L.P., Leesburg, Virginia; Jason H. Ballum, Reed Smith, L.L.P., Richmond, Virginia, for Appellee Loudoun County School Board. Judith Williams Jagdmann, Attorney General of Virginia, William E. Thro, State Solicitor General, A. Cameron O'Brion, Associate Solicitor General, Richmond, Virginia, for Appellee Commonwealth of Virginia. Peter D. Keisler, Assistant Attorney General, Paul J. McNulty, United States Attorney, Lowell V. Sturgill, Jr., Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C., for Intervenor, the United States. Troy King, Attorney General of Alabama, John J. Park, Jr., Assistant Attorney General, Charles B. Campbell, Assistant Attorney General, Office of the Attorney General State of Alabama, Montgomery, Alabama, for the State of Alabama; Scott J. Nordstrand, Acting Attorney General of Alaska, Juneau, Alaska; Mike Beebe, Attorney General of Arkansas, Little Rock, Arkansas; John W. Suthers, Attorney General of Colorado, Denver, Colorado; M. Jane Brady, Attorney General of Delaware, Wilmington, Delaware; Charles J. Crist, Jr., Attorney General of Florida, Tallahassee, Florida; Thurbert E. Baker, Attorney General of Georgia, Atlanta, Georgia; Mark J.

Bennett, Attorney General of Hawaii, Honolulu, Hawaii; Lawrence G. Wasden, Attorney General of Idaho, Boise, Idaho; Lisa Madigan, Attorney General of Illinois, Chicago, Illinois; Steve Carter, Attorney General of Indiana, Indianapolis, Indiana; Phill Kline, Attorney General of Kansas, Topeka, Kansas, Gregory D. Stumbo, Attorney General of Kentucky, Frankfort, Kentucky; J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland; Jim Hood, Attorney General of Mississippi, Jackson, Mississippi; Mike McGrath, Attorney General of Montana, Helena, Montana; Brian Sandoval, Attorney General of Nevada, Carson City, Nevada; Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina; Wayne Stenehjem, Attorney General of North Dakota, Bismarck, North Dakota; Jim Petro, Attorney General of Ohio, Columbus, Ohio; W.A. Drew Edmondson, Attorney General of Oklahoma, Oklahoma City, Oklahoma; Hardy Myers, Attorney General of Oregon, Salem, Oregon; Thomas W. Corbett, Jr., Attorney General of Pennsylvania, Harrisburg, Pennsylvania; Henry McMaster, Attorney General of South Carolina, Columbia, South Carolina; Lawrence E. Long, Attorney General of South Dakota, Pierre, South Dakota; Paul G. Summers, Attorney General of Tennessee, Nashville, Tennessee; Greg Abbott, Attorney General of Texas, Austin, Texas; Mark L. Shurtleff, Attorney General of Utah, Salt Lake City, Utah; Rob McKenna, Attorney General of Washington, Olympia, Washington; Patrick J. Crank, Attorney General of Wyoming, Cheyenne, Wyoming, Amici Curiae Supporting Appellees.

Before WILLIAMS, MOTZ, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion. Judge DUNCAN wrote a separate concurring opinion. Judge MOTZ wrote a separate opinion concurring in the judgment.

WILLIAMS, Circuit Judge.

Edward R. Myers, on behalf of himself and his minor children, appeals the dismissal of his action, alleging that Va.Code Ann. § 22.1–202(C) (Michie 2003) (the Recitation Statute), which provides for daily, voluntary recitation of the Pledge of Allegiance (the Pledge) in Virginia's public schools, violates the Establishment Clause. The district court, applying the three part test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), upheld the Recitation Statute, concluding that the statute did not have a religious purpose or effect and did not create an excessive governmental entanglement with religion. Because the Pledge is not a religious exercise and does not threaten an establishment of religion, we affirm.

I.

Myers belongs to the Anabaptist Mennonite faith, which condemns the mixture of church and state. Anabaptist Mennonites are a Christian sect that "left Central Europe in late 1600 because of religious persecution for belief in the separation of church and state." (J.A. at 7.) According to the Mennonite Confession of Faith, "[t]he primary allegiance of all Christians is to Christ's kingdom, not the state or society. Because their citizenship is in heaven, Christians are called to resist the idolatrous temptation to give to the state the devotion that is owed to God." (J.A. at 7.)

Myers resides in Loudoun County, Virginia, and, at the time he filed his complaint, his two sons attended Loudoun County public schools, one in first grade and one in third grade. Because of Myers's belief in a separation of church

and state and his fear that Loudoun County was indoctrinating his children with a " 'God and Country' religious worldview," (J.A. at 7), Myers objected to Loudoun County's policy of having all school-aged children recite the Pledge each school day.

Loudoun County's policy was enacted pursuant to the Recitation Statute, which provides:

Each school board shall require the daily recitation of the Pledge of Allegiance in each classroom of the school division and shall ensure that the flag of the United States is in place in each such classroom. Each school board shall determine the appropriate time during the school day for the recitation of the Pledge. During · such Pledge of Allegiance, students shall stand and recite the Pledge while facing the flag with their right hands over their hearts or in an appropriate salute if in uniform; however, no student shall be compelled to recite the Pledge if he, his parent or legal guardian objects on religious, philosophical or other grounds to his participating in this exercise. Students who are thus exempt from reciting the Pledge shall remain quietly standing or sitting at their desks while others recite the Pledge and shall make no display that disrupts or distracts others who are reciting the Pledge. School boards shall provide appropriate accommodations for students who are unable to comply with the procedures described herein due to disability.

The school board's code of conduct shall apply to disruptive behavior during the recitation of the Pledge in the same manner as provided for other circumstances of such behavior.

Va.Code Ann. § 22.1–202(C).[1]

The Pledge was enacted in 1942, during World War II, in order "to codify and emphasize the existing rules and customs pertaining to the display and use of the flag of the United States of America." H.R.Rep. No.2047, 77th Cong., 2d Sess. 1 (1942). The Pledge was amended in 1954, and it now reads: "I pledge allegiance to the flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all." 4 U.S.C.A. § 4 (West 2005) (the Pledge statute).

On October 15, 2002, Myers, who is not an attorney, filed a lawsuit under 42 U.S.C.A. § 1983 (West 2003) [2] against the

---

**1.** As the text of the Recitation Statute makes clear, students are permitted to opt-out of reciting the Pledge, and thus it does not present the constitutional problems at issue in *West Virginia v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In *Barnette*, the Court struck down a West Virginia statute that mandated daily recitation of the Pledge by school children and required expulsion of students who refused to participate. 319 U.S. at 627–29, 63 S.Ct. 1178. The Court, explaining that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," struck the statute as violating the Free Speech clause of the First Amendment as incorporated by the Fourteenth Amendment. *Id.* at 642, 63 S.Ct. 1178. Because the Recitation Statute permits students to opt-out, no concern regarding free speech arises.

**2.** 42 U.S.C.A. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

Original jurisdiction over suits alleging a cause of action under § 1983 is vested in the district courts pursuant to 28 U.S.C.A. § 1343 (West 1993).

Loudoun County School Board (the Board) in the United States District Court for the Eastern District of Virginia. Acting pro se on behalf of himself and his two minor children, Myers alleged that the daily recitation of the Pledge in Loudoun County schools violated the Establishment Clause, and, accordingly, that the Recitation Statute was facially unconstitutional.[3] The district court interpreted Myers's complaint to provide that the Recitation Statute, by requiring recitation of the Pledge, was attempting to establish a " 'civil religion of God and Country' as a state supported religion." (J.A. at 64.) The Commonwealth of Virginia intervened to defend the constitutionality of the Recitation Statute, and moved, in conjunction with the Board, for dismissal of Myers's action pursuant to Federal Rule of Civil Procedure 12(b)(6) (West 1992). Following a hearing, the district court granted the motion to dismiss, concluding that, under the three-part *Lemon* test, the Recitation Statute was constitutional on its face and as applied by the Board. Myers noted a timely appeal.[4] On appeal, Myers contends that because of the inclusion of the words "under God," the Pledge is a religious exercise and that, accordingly, the Recitation Statute violates the Establishment Clause. We possess jurisdiction under 28 U.S.C.A. § 1291 (West 1993).

## II.

As noted, Myers filed his complaint pro se on behalf of himself and his minor children. Although the Appellees did not argue that the district court erred in allowing Myers to litigate pro se below, we nevertheless raised this threshold issue at oral argument sua sponte because an "infant is always the ward of every court wherein his rights or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done to him." *Doe v. Bd. of Educ.*, 165 F.3d 260, 264 (4th Cir.1998) (quoting *Wenger v. Canastota Cent. Sch. Dist.*, 146 F.3d 123, 125 (2d Cir.1998) (holding that appellate court has an obligation sua sponte to inquire into whether pro se parent had authority to litigate claims on behalf of his minor children)).

In addressing this issue, it is useful to delineate the nature of the claims that Myers presses. First, Myers alleges that *he himself* has suffered an injury cognizable under the Establishment Clause from his children's daily exposure to the Pledge; *i.e.*, that the Pledge policy infringes *his right* to direct the religious education of

---

3. Myers's complaint raised a litany of claims in addition to the facial Establishment Clause challenge, including claims under the Free Exercise Clause, the Due Process Clause of the Fourteenth Amendment, Title IV of the Civil Rights Act of 1964, and an as-applied challenge under the Establishment Clause. The district court rejected each of these claims, and Myers expressly abandoned all but his two Establishment Clause claims on appeal. We address the facial challenge in the text. As for the as-applied challenge, we have reviewed the parties' briefs and supplementary materials and find no reason to disagree with the district court's conclusion that Myers suffered no cognizable harm from Loudoun County's actions allowing the Boy Scouts to recruit on school grounds, posting the national motto, and giving meal coupons to students who exhibit good citizenship. *See Myers v. Loudoun County Sch. Bd.*, 251 F.Supp.2d 1262, 1270, 1273, 1276 (E.D.Va. 2003).

4. Although, on appeal, the United States has intervened to defend the constitutionality of the Pledge statute, it is worth noting that Myers's challenge is not to the Pledge statute itself, but to the Recitation Statute's requirement that the Pledge be recited in Virginia public schools. In addition to the amicus brief of the United States, the State of Alabama, joined by thirty other states, has filed an amicus brief supporting the constitutionality of the Recitation Statute.

his children. Second, Myers alleges that *his minor children* have suffered an injury cognizable under the Establishment Clause from their exposure to the daily recitation of the Pledge in Loudoun County's school classrooms. While Myers had the authority to litigate his own claim below, we conclude, for the reasons that follow, that Myers did not have the authority to litigate his children's claim below. We believe, however, that remand of their claim is not necessary.

■ The Federal Rules of Civil Procedure, incorporating Virginia law, authorize Myers to raise his children's claim despite the fact that their claim seeks to vindicate *their* rights.[5] The difficulty therefore is not that Myers *asserted* his children's claim, but rather that he attempted to *litigate* that claim pro se. An individual unquestionably has the right to litigate his *own* claims in federal court, before both the district and appellate courts. *See* 28 U.S.C.A. 1654 (West 1994) ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel...."); *United States v. Lawrence*, 605 F.2d 1321, 1324 (4th Cir.1979) ("Under [§ 1654] ... a [litigant] in federal court has long been guaranteed the right to self-representation...."). This right "reflects a respect for the choice of an individual citizen to plead his or her own cause." *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir.1990). It "is a right of high standing, not simply a practice to be honored or dishonored by a court depending on its assessment of the desiderata of a particular case." *Id.*

The right to litigate for *oneself*, however, does not create a coordinate right to litigate for *others*. *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (holding that a pro se prisoner may not litigate the interests of other prisoners in class action). The reasoning behind this rule is two-fold: it protects the rights of those before the court, *see id.* ("the competence of a layman [litigating for] himself [is] clearly too limited to allow him to risk the rights of others"), and jealously guards the judiciary's authority to govern those who practice in its courtrooms, *see Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 231 (3d Cir.1998) ("Requiring a minimum level of competence protects not only the [client] but also his or her adversaries and the court from poorly drafted, inarticulate, and vexatious claims.").

Myers contends that Federal Rule of Appellate Procedure 3(c)(2) (West Supp. 2005), which provides that "[a] pro se notice of appeal is considered filed on behalf of the signer and the signer's spouse and minor children (if they are parties), unless the notice clearly indicates otherwise," implicitly contemplates that a pro se parent may litigate the claims of his minor children. We do not believe, however, that Rule 3(c)(2) bears the inference Myers draws. Instead, that rule implicitly acknowledges that an appellant must file his notice of appeal within a certain limited time after the district court has entered judgment, *see* Fed. R.App. P. 4(a)(1)(A) (West Supp.2005), and that *at that time* the appellant, who presumably lost before the district court and may accordingly be

---

5. Myers's children, as minors, lack the capacity to sue under Virginia law. *See* Fed. R.Civ.P. 17(b) ("capacity to sue ... shall be determined by the law of the state in which the district court is held"); Va.Code Ann. § 8.01–8 (Michie 2000) ("Any minor entitled to sue may do so by his next friend."). He, as

their parent, may assert claims on their behalf. *See* Fed.R.Civ.P. 17(c) ("An infant or incompetent person who does not have a duly appointed representative may sue by a next friend...."); Va.Code Ann. § 8.01–8 ("Either or both parents may sue on behalf of a minor as his next friend.").

dissatisfied with counsel's performance, may be without counsel. Rule 3(c)(2) therefore simply allows a pro se litigant proceeding on behalf of his minor children to file a timely notice of appeal before securing appellate counsel.[6]

■■■ We therefore join the vast majority of our sister circuits in holding that non-attorney parents generally may not litigate the claims of their minor children in federal court. *See Shepherd v. Wellman,* 313 F.3d 963, 970 (6th Cir.2002); *Navin v. Park Ridge Sch. Dist.,* 270 F.3d 1147, 1149 (7th Cir.2001); *Devine v. Indian River County Sch. Bd.,* 121 F.3d 576, 581 (11th Cir.1997); *Johns v. County of San Diego,* 114 F.3d 874, 877 (9th Cir. 1997); *Osei–Afriyie v. Med. Coll.,* 937 F.2d 876, 882–83 (3d Cir.1991); *Cheung,* 906 F.2d at 61; *Meeker v. Kercher,* 782 F.2d 153, 154 (10th Cir.1986).[7] Applying this rule here, we conclude that Myers was not authorized to litigate pro se the claim of his minor children.

■■■ We suspect that in the rare cases in which a non-attorney parent litigates his children's claim in the district court, remand for further proceedings will be the only course of action on appeal that en-sures the children's interests are not prejudiced by their well-meaning, but legally untrained parents. *See, e.g., Cheung,* 906 F.2d at 61 (remanding child's claim litigated by a non-attorney parent for retention or appointment of counsel, or, failing either of these options, for dismissal of the claim without prejudice). We do not believe, however, that remand is warranted here. The children, like their father, now have competent counsel, and they have specifically asked us to decide the appeal. Moreover, as discussed in more detail below, our resolution of the children's claim is based purely on an issue of law, and that claim is in no meaningful way prejudiced by Myers's pro se representation below.

With this threshold issue resolved, we now turn to the merits of this appeal.

## III.

■■■ We review de novo the district court's dismissal of Myers's complaint under Federal Rule of Civil Procedure 12(b)(6), "accept[ing] as true all well-pleaded allegations." *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan L.L.C.,* 385 F.3d 836, 841 (4th Cir.2004). Myers

---

**6.** Myers also argues that Virginia law allows a parent to litigate his minor children's claims pro se, *see, e.g., Coffey v. Va. Birth–Related Neurological Injury Comp. Program,* 37 Va. App. 390, 558 S.E.2d 563 (2002), and contends we should interpret 28 U.S.C.A. § 1654 by deferring to Virginia law and allowing him to do the same here. We reject this contention. Even assuming that *Coffey* represented Virginia's position on this matter and that we should give respect to that position in interpreting a federal statute, *Coffey* holds only that a pro se parent may litigate his children's claims *before the Workers's Compensation Commission.* 558 S.E.2d at 566. We are aware of no Virginia case authorizing a non-attorney parent to litigate his minor children's claims before a court of law.

**7.** In *Machadio v. Apfel,* 276 F.3d 103, 106 (2d Cir.2002) and in *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000), the Second and Fifth Circuits allowed non-attorney parents to represent minor children pro se in appeals from the denial of SSI benefits, noting the unique policy considerations involved in such cases. *Machadio,* 276 F.3d at 107; *Harris,* 209 F.3d at 416. Even if, in the appropriate case, we were to adopt the holdings of *Machadio* and *Harris,* we, like the Second Circuit, would have no trouble limiting that rule to the unique facts involved in an SSI appeal. *Compare Machadio,* 276 F.3d at 107 (holding that a pro se parent may litigate on behalf of his minor child in an SSI appeal) *with Cheung v. Youth Orchestra Found. of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990) (holding that a non-attorney parent generally may not litigate pro se on behalf of a minor child).

brought this suit under § 1983, alleging that the Recitation Statute violates the Establishment Clause of the First Amendment.

### A.

The Establishment Clause provides, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Although applicable originally only against the federal government, the Establishment Clause has been incorporated against the states by the Fourteenth Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

There is "no single mechanical formula that can accurately draw the constitutional line in every case." *Van Orden v. Perry*, 125 S.Ct. 2854 (June 27, 2005) (Breyer, J., concurring in the judgment). Instead, in "borderline cases," there can be no "test-related substitute for the exercise of legal judgment." *Id.* at 3. The history of our nation, coupled with repeated dicta from the Court respecting the constitutionality of the Pledge guides our exercise of that legal judgment in this case.

### 1.

As Justice Holmes recognized in *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921), sometimes "a page of history is worth a volume of logic." And, in the context of this case, the Establishment Clause of the First Amendment must be viewed "in the light of its history and the evils it was designed forever to suppress."[8] *Everson*, 330 U.S. at 14–15, 67 S.Ct. 504. A review of the Establishment Clause's historical setting reveals that the "first and most immediate purpose [of the Establishment Clause] rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The primary evil the Establishment Clause was intended to combat was the practice of European nations "compell[ing] [individuals] to support and attend government favored churches." *Id.* at 8, 67 S.Ct. 504. With that evil in mind,

> The "establishment of religion" clause of the First Amendment means at least

---

**8.** I do not present this historical analysis to argue that the Establishment Clause does not embody the idea that the "First Amendment mandates governmental neutrality between [one] religion and [another] religion, and between religion and nonreligion." *McCreary County v. Am. Civil Liberties Union*, slip op. at 11, 125 S.Ct. 2722 (June 27, 2005) (citations omitted). *See Van Orden v. Perry*, No. 03–1500, slip op. at 7, 125 S.Ct. 2854 (plurality) (June 27, 2005) ("[O]ur analysis is driven both by the nature of [the Pledge] and by our Nation's history."); *see also Van Orden*, slip op. at 1, 125 S.Ct. 2854 (Breyer, J., concurring in the judgment) (noting that "[o]ne must refer … to the basic purposes of [the Religion Clauses]" in interpreting them). Rather, I present it to show that certain patriotic references to the Deity do not violate the neutrality principle. Judge Duncan's suggestion that my use of a historical analysis to support my conclusion that the Pledge does not violate the Establishment Clause "comes

close[] … to the line drawn by … *McCreary*," *post*, is therefore unfounded. My discussion relies heavily upon Supreme Court cases that themselves relied on historical practice. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). *McCreary* did not purport to overrule or limit the analysis in those cases. If *McCreary's* neutrality principle is as vibrant as my good sister suggests, it seems *Van Orden*, decided on the same day, would not have garnered the concurrences of a majority of Justices. *See Van Orden*, 125 S.Ct. 2854, slip op. at 2 (Breyer, J., concurring in the judgment) ("[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious. *See, e.g., Marsh* []. Such absolutism is … *inconsistent with our national traditions.* …" (emphasis added)).

this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance.

*Id.* at 15–16, 67 S.Ct. 504.

"The [Establishment Clause], however, does not say that in every and all aspects there shall be a separation of Church and State." *Zorach v. Clauson,* 343 U.S. 306, 312, 72 S.Ct. 679, 96 L.Ed. 954 (1952). Instead, the Establishment Clause must also be viewed with the understanding that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Id.* at 313, 72 S.Ct. 679. "The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 213, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The Establishment Clause "does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises . . . as to have meaningful and practical impact." *Id.* at 308, 72 S.Ct. 679 (Goldberg, J., concurring). Thus, the Court has "declined to construe the Religion Clauses with a literalness that would

undermine the ultimate constitutional objective as illuminated by history." *Walz v. Tax Comm'n,* 397 U.S. 664, 671, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).[9]

The paradigmatic example of the role of history in the Court's Establishment Clause jurisprudence is *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In *Marsh,* a Nebraska taxpayer brought suit alleging that Nebraska's policy of using public funds to pay for a chaplain to open each state legislative day with a non-denominational prayer violated the Establishment Clause. *Id.* at 785, 103 S.Ct. 3330. In upholding this practice, the Court drew heavily upon the fact that the First Congress, "as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." *Marsh,* 463 U.S. at 787–88, 103 S.Ct. 3330. The Court held that, far from being unconstitutional:

> opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an establishment of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id.* at 792, 103 S.Ct. 3330.

Apart from the practice of legislative prayer upheld in *Marsh,* the history surrounding our nation's founding is filled with activities similar in kind that illuminate our resolution of this case. The Declaration of Independence, composed by Thomas Jefferson in 1776, asserted that all

---

9. Some Justices have suggested the Establishment Clause must be interpreted to "permit not only legitimate practices two centuries old but also any other practices with no greater potential for an establishment of religion." *See, e.g., County of Allegheny v. Am. Civil Liberties Union,* 492 U.S. 573, 669, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part, joined by Rehnquist, Chief J., White, J., and Scalia, J.).

men were "endowed by their Creator with certain unalienable rights," and claimed that the colonists had the right to "dissolve the political bands" because of "the laws of nature and of nature's God." The Declaration of Independence para. 1 (U.S.1776). The Constitution itself claims it was completed in the "Year of Our Lord" 1787, and exempts Sundays from the President's ten-day period to exercise his veto power. U.S. Const. art. VII; art. I § 7.

The First Congress "urged President Washington to proclaim a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God." *Lynch v. Donnelly*, 465 U.S. 668, 675 n. 2, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (internal quotation marks omitted). In response, President Washington proclaimed such a day to "offer[ ] our prayers and thanksgiving to the Great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions."[10] *Id.*

The recognition of religion in these early public pronouncements is important, unless we are to presume the "founders of the United States [were] unable to understand their own handiwork." *Sherman v. Cmty Consol. Sch. Dist. 21*, 980 F.2d 437, 445 (7th Cir.1992). These patriotic references to the Deity, moreover, are not limited to the time surrounding the founding of our nation. The Supreme Court has opened its sessions since the time of Chief Justice John Marshall in the early nine-teenth century with "God save the United States and this honorable court." *Engel*, 370 U.S. at 446, 82 S.Ct. 1261 (Stewart, J., dissenting). Our own court, since its infancy in 1891, has opened sessions with the same refrain. President Abraham Lincoln, in his Gettysburg Address, made famous the very phrases to which Myers now objects: "That we here highly resolve that these dead shall not have died in vain; that this *Nation, under God,* shall have a new birth of freedom; and that government of the people, by the people, and for the people shall not perish from the Earth." 9 Annals of America 463 (Encyclopedia Britannica 1968) (emphasis added). Following the Civil War, in 1865, Congress mandated the inscription of "In God We Trust" on coins. Act of Mar. 3, 1865, ch. 102 § 5, 13 Stat. 518. In 1956 Congress made this slogan the National Motto, 36 U.S.C.A. § 302 (West 2001) and required its placement on all United States currency. 31 U.S.C.A. § 5112(d)(1) (West Supp.2005).

I need not catalogue exhaustively the list of official acknowledgments of religion in American life that have not been challenged as establishments of religion. For purposes of my discussion, it suffices to note that "[o]ur history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Lynch,*

---

10. Washington also stated in his first inaugural address:

> [I]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the council of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes.

3 Annals of America 344–45 (Encyclopedia Britannica 1968).

Every President since Washington has referred to God in his inaugural address, including our current President Bush and his immediate predecessors, Presidents Clinton and Bush. Moreover, Presidents swear their oath of office on a Bible, administered by the Chief Justice of the United States Supreme Court.

465 U.S. at 675, 104 S.Ct. 1355. We have "an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* at 674, 104 S.Ct. 1355. If the founders viewed legislative prayer and days of thanksgiving as consistent with the Establishment Clause, it is difficult to believe they would object to the Pledge, with its limited reference to God. The Pledge is much less of a threat to establish a religion than legislative prayer, the open prayers to God found in Washington's prayer of thanksgiving, and the Declaration of Independence.

2.

In addition to this history of religious acknowledgment, in the specific context before us, the Court and the individual Justices thereof have made clear that the Establishment Clause, regardless of the test to be used, does not extend so far as to make unconstitutional the daily recitation of the Pledge in public school. Beginning with *Engel,* in every case in which the Justices of the Court have made mention of the Pledge, it has been as an assurance that the Pledge is not implicated by the Court's interpretation of the Establishment Clause. *See Engel,* 370 U.S. at 449–50, 82 S.Ct. 1261 (Stewart, J., dissenting); *Wallace v. Jaffree,* 472 U.S. 38, 78 n. 5, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring) ("In my view, the words 'under God' in the Pledge ... serve as an acknowledgment of religion with the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future" (internal quotation marks omitted)); *Wallace,* 472 U.S. at 88, 105 S.Ct. 2479 (Rehnquist, J., dissenting) (holding Pledge unconstitutional "would of course make a mockery of our decision-making in Establishment Clause cases"); *Lynch,* 465 U.S. at 716, 104 S.Ct. 1355 (Brennan, J., dissenting) ("such practices as ... the references to God contained in the Pledge of Allegiance can best be understood, in Dean Rostow's apt phrase, as a form of 'ceremonial deism,' protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content"); [11] *County of Allegheny v. Am. Civil Liberties Union,* 492 U.S. 573, 674 n. 10, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part) (noting the Pledge cannot be construed as an establishment of religion); *Lee v. Weisman,* 505 U.S. 577, 638–39, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting) (same). In *Lynch,* the Court described the Pledge as an "example[ ] of reference to our religious history," and noted that it is "recited by many thousands of public school children—and adults—every year." *Lynch,* 465 U.S. at 676, 104 S.Ct. 1355. In *County of Allegheny,* the Court took pains to remark that "there is an obvious distinction between creche displays and references to God in the motto and the pledge," and noted that prior decisions, in dicta, had "characteriz[ed] [the motto and Pledge] as consistent with the proposition that government may not communicate an endorsement of religious belief." *County of Allegheny,* 492 U.S. at 602–03, 109 S.Ct. 3086.

---

11. The phrase "ceremonial deism" is somewhat disconcerting because it suggests that, when "initially used" phrases like "in God we trust" and "under God" "violated the Establishment Clause because they had not yet been rendered meaningless by repetitive use." *Sherman v. Community Consolidated Sch. Dist. 21,* 980 F.2d 437, 448 (7th Cir.1992) (Manion, J., concurring). Moreover, "ceremonial deism" provides no account for why only words with religious connotations lose meaning, and not words like "liberty, and justice for all."

In fact, just last term, in *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), several justices offered lengthy defenses of the constitutionality of a State's policy requiring daily, voluntary, recitation of the Pledge by public school children. Michael Newdow, like Myers, objected to a public school policy which mandated daily, voluntary, recitation of the Pledge by school children. *Id.* at 2305. Although the Court held that Newdow lacked standing, several Justices, took the opportunity to address the question of the Pledge's constitutionality. *Id.* at 2312, 2321, 2327. Each Justice who did so concluded that the Pledge was constitutional. *Id.*

Although we are not bound by dicta or separate opinions of the Supreme Court, "observations by the Court, interpreting the First Amendment and clarifying the application of its Establishment Clause jurisprudence, constitute the sort of dicta that has considerable persuasive value in the inferior courts." *Lambeth v. Bd. of County Comm'n*, 407 F.3d 266, 271 (4th Cir.2005). *See also Sherman*, 980 F.2d at 448 ("If the Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously.") Moreover, in the context of this case it is perhaps more noteworthy that, given the vast number of Establishment Clause cases to come before the Court, *not one Justice has ever suggested that the Pledge is unconstitutional.* In an area of law sometimes marked by befuddlement and lack of agreement, such unanimity is striking.[12]

### B.

Myers's primary argument in attempting to avoid this weight of dicta and histo-ry is that daily recitation of the Pledge amounts to daily recitation of prayer in public schools in violation of *Lee*. According to this argument, even if recitation of the Pledge is voluntary, students will be indirectly coerced into accepting its religious message in violation of the Establishment Clause.

The Court has reflected upon the important role that indirect coercion plays in determining if a public school activity violates the Establishment Clause. *See Lee*, 505 U.S. at 592, 112 S.Ct. 2649 ("[P]rayer exercises in public schools carry a particular risk of indirect coercion."); *Engel*, 370 U.S. at 431, 82 S.Ct. 1261 ("[T]he indirect coercive pressure upon religious minorities to conform" to prayers "is plain."). For instance, in *Lee*, a public high school selected a Rabbi to give a non-denominational prayer, pursuant to written guidelines provided by school officials, at high school graduation. 505 U.S. at 581–82, 112 S.Ct. 2649. Students were to remain standing during the prayer, which followed the recitation of the Pledge. Although high school students were not required to attend graduation to receive their diplomas or to participate in saying the prayer, the Court found the practice unconstitutional. *Id.* at 598, 112 S.Ct. 2649. The Court explained that indirect coercion may be unconstitutional when government orchestrates "the performance of a formal religious exercise" in a fashion that practically obliges the involvement of non-participants. *Id.* at 586, 112 S.Ct. 2649.

Of course, as this statement makes clear, all of the cases holding that indirect coercion of religious activity violates the Establishment Clause presuppose that the

---

12. Myers argues that Congress's addition of the phrase "under God" to the Pledge reflects an impermissible religious purpose. The dicta affirming the Pledge, of course, came after that amendment, and therefore undercuts Myers argument. Moreover, Myers does not argue that the drafters of the Recitation Statute had an impermissible religious purpose.

challenged activity is a *religious exercise.* See, e.g., *Lee,* 505 U.S. at 599, 112 S.Ct. 2649 ("[t]he sole question presented is whether a *religious exercise* may be conducted at a graduation ceremony") (emphasis added). *See also Newdow v. U.S. Congress,* 328 F.3d 466, 476 (9th Cir.2003) (O'Scannlain, J., dissenting from denial of rehearing en banc) (noting the "crucial factor" in school prayer cases is "the nature of the exercise in which the students were asked to participate"), *rev'd by Elk Grove Unified Sch. Dist.,* 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98. Our precedent also recognizes this distinction: "[u]nder the Supreme Court's decisions ... school officials may not, consistent with the Establishment Clause, compel students to participate in a *religious activity.*" *Mellen v. Bunting,* 327 F.3d 355, 371 (4th Cir.2003) (emphasis added). Moreover, in all of the cases involving school prayer, the Court iterated that fleeting references to God in the class-room were not unconstitutional. *See Lee,* 505 U.S. at 597, 112 S.Ct. 2649 ("We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive."); *Schempp,* 374 U.S. at 303, 83 S.Ct. 1560 ("The reference to divinity in the revised pledge of allegiance, for example, may merely recognize the historical fact that our Nation was believed to have been founded 'under God.' ") (Brennan, J., concurring); *Engel,* 370 U.S. at 435 n. 21, 82 S.Ct. 1261 ("[P]atriotic or ceremonial occasions [like the recitation of the Declaration of Independence] bear no true resemblance to the unquestioned religious exercise that the State ... has sponsored in this instance.").

Thus, although religious exercises in public schools, even if voluntary, may violate the Constitution because they can indirectly coerce students into participating, nothing in any of the school prayer cases suggests the same analysis applies when the challenged activity is not a religious exercise. And distinguishing this case from *Engel* and its progeny is the simple fact that the Pledge, unlike prayer, is not a religious exercise or activity, but a patriotic one. "The very purpose of a national flag is to serve as a symbol of our country...." *Texas v. Johnson,* 491 U.S. 397, 405, 109 S.Ct. 2533, 105 L.Ed.2d 342. Pledging allegiance to that flag is "a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles." *Elk Grove Unified Sch. Dist.,* 124 S.Ct. at 2305; *see also Engel,* 370 U.S. at 435 n. 21, 82 S.Ct. 1261; *Sherman,* 980 F.2d at 445 (noting founding fathers did not deem "ceremonial invocations of God," like the Pledge, "as 'establishment.' "). Indeed, the Recitation Statute itself appears in a statutory section mandating that Virginia public schools teach the history and importance of the flag in school in order to promote better citizenship among students. Va.Code Ann. § 22.1–202.

Undoubtedly, the Pledge contains a religious phrase, and it is demeaning to persons of any faith to assert that the words "under God" contain no religious significance. *See Van Orden,* 125 S.Ct. 2854, slip op. at 4 (June 27, 2005) (Thomas, J., concurring) ("words such as 'God' have religious significance"). The inclusion of those two words, however, does not alter the *nature* of the Pledge as a patriotic activity. The Pledge is a statement of loyalty to the flag of the United States and the Republic for which it stands; it is performed while standing at attention, facing the flag, with right hand held over heart. *See also West Virginia v. Barnette,* 319 U.S. 624, 641, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (referring to the Pledge as a "patriotic ceremony"). A prayer, by contrast, is "a solemn and humble approach to

Divinity in word or thought." *Webster's Third New Int'l Dictionary* 1782 (1986). It is a personal communication between an individual and his deity, "with bowed head, on bended knee." *Newdow,* 328 F.3d at 478 (O'Scannlain, J., dissenting from denial of rehearing en banc). The prayers ruled unconstitutional in *Lee, Schempp,* and *Engel,* and were viewed by the Court as distinctly religious exercises. It was the religious nature of these activities that gave rise to the concern that non-participating students would be indirectly coerced into accepting a religious message. The indirect coercion analysis discussed in *Lee, Schempp,* and *Engel,* simply is not relevant in cases, like this one, challenging non-religious activities. Even assuming that the recitation of the Pledge contains a risk of indirect coercion, the indirect coercion is not threatening to establish religion, but patriotism. "Separation of church from state does not imply separation of state from state." *Sherman,* 980 F.2d at 444. Thus, the fact that indirect coercion may result from voluntary recitation of the Pledge in school classrooms is of no moment under the Establishment Clause. Because the Pledge is by its nature a patriotic exercise, not a religious exercise, the school prayer cases, *Lee, Schempp,* and *Engel,* are not controlling. Moreover, as the history of our nation makes clear, acknowledgments of religion by government simply do not threaten to establish religion in the same manner that even voluntary school prayer does.

## IV.

In sum, "the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *Schempp,* 374 U.S. at 308, 83 S.Ct. 1560 (Goldberg, J., concurring). We feel confident in stating that "it is difficult to detect any signs of incipient theocracy springing up since the Pledge

was amended in 1954." *Newdow,* 328 F.3d at 492 n. 4 (Fernandez, J., dissenting); *see also Van Orden,* 125 S.Ct. 2854, slip op. at 6 (Breyer, J., concurring in the judgment) (finding relevant, in holding that Ten Commandments display outside of Texas State Capitol constitutional, that forty years had passed before a constitutional challenge was raised to the display). The notion that official acknowledgments of religion and its role in the founding of our nation such as that in the Pledge "pose a real danger of establishment of a state church" is simply "farfetched." *Lynch,* 465 U.S. at 686, 104 S.Ct. 1355. The Establishment Clause works to bar "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz,* 397 U.S. at 668, 90 S.Ct. 1409. The Pledge, which is not a religious exercise, poses none of these harms and does not amount to an establishment of religion. Accordingly, the Recitation Statute, requiring daily, voluntary, recitation of the Pledge in the classrooms of Virginia's public schools is constitutional.

## V.

For the foregoing reasons, the opinion of the district court is affirmed.

*AFFIRMED.*

DUNCAN, Circuit Judge, concurring:

I write to join in all but Part III–A–1 of Judge Williams' fine opinion. I agree, of course, with her conclusion in that section that the Pledge does not violate the Establishment Clause. I am concerned, however, that the analysis—flowing as it does from the premise that history tells us that some government invocations of religion are insulated from the strictures of the Establishment Clause—comes closer to crossing the line drawn by the Supreme Court majority in *McCreary County v.*

*Am. Civil Liberties Union,* —— U.S. ——, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005), than is necessary to sustain the state law at issue here.

One of the most significant points of contention between the majority and the dissent in *McCreary* focuses on whether official acknowledgments of God (catalogued at length by Justice Scalia in dissent and cited here in part III–A–1) prove that government may "espouse submission to the divine will" without offending the principle of governmental neutrality that undergirds the Establishment Clause. *McCreary,* 125 S.Ct. at 2743. Whereas the dissent relied upon historical evidence tending to show that the Founders believed that some official acknowledgments of religion were compatible with the Establishment Clause, the majority cited other evidence suggesting "that the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, including neutrality in statements acknowledging religion." *Id.* at 2744. Accordingly, a majority of Justices agreed that, beyond the broad principle of governmental neutrality, "[t]he fair inference is that there was no common understanding about the limits of the establishment prohibition" at the founding. *Id.*

As Justice O'Connor observed, "[r]easonable minds can disagree about how to apply the Religion Clauses in a given case. But the goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society." *Id.* at 2746 (O'Connor, J., concurring). *McCreary* thus reaffirmed the principle that "the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *Id.*

at 2733 (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).* Mindful of *McCreary's* lessons, I believe that this case is best resolved by reliance upon (1) the Supreme Court's repeated assurances, albeit in dicta, that the Pledge does not violate the Establishment Clause, and (2) authority suggesting that recitation of the Pledge is not a religious activity, but rather a "patriotic exercise designed to foster national unity and pride" in the ideals that the flag symbolizes. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 2305, 159 L.Ed.2d 98 (2004). I do not believe that we need to go any further to resolve the issue before us.

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

The Supreme Court has spoken repeatedly on the precise issue we address today. The Court has consistently said that inclusion of the phrase "under God" in the Pledge of Allegiance does not offend the Establishment Clause. For this reason, I concur in the judgment—but only the judgment.

In a series of cases beginning with *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and continuing through *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), the Court and many Justices individually have unequivocally stated, albeit in dicta, that the Pledge of Allegiance to a "Nation under God" does not violate the Constitution. Moreover, no member of the Supreme Court has ever suggested the contrary. *See ante.*

We and our sister circuits have "frequently noted" that lower federal courts

---

* I intend no suggestions about the "vibrancy" of this principle beyond what is suggested by the quoted language itself.

generally must treat the "carefully considered language of the Supreme Court, even if technically dictum, . . . as authoritative." *Wynne v. Town of Great Falls,* 376 F.3d 292, 298 n. 3 (4th Cir.2004) (internal quotation marks and citation omitted) (collecting cases). Such deference is especially appropriate when, as here, we encounter a decades-long succession of statements from the Court that answers the specific question before us. *See Lambeth v. Bd. of Comm'rs,* 407 F.3d 266, 271 (4th Cir.2005) (noting the "considerable persuasive value" of repeated Supreme Court dicta stating that the national motto, "In God We Trust," does not violate the Establishment Clause).

We need not search further than these assurances to resolve the issue before us, and I would not do so. For without the Court's explicit guidance, this could be an extremely close case, requiring navigation through the Supreme Court's complicated Establishment Clause jurisprudence. At least one Justice has recognized the difficulties involved. *See Newdow,* 124 S.Ct. at 2327–30 (Thomas, J., concurring in the judgment).

First, a pledge to a country "under God" might be regarded as religious activity. Certainly, the Supreme Court has clarified that prayer is not the only religious activity with which the First Amendment is concerned. *See Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 119, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (characterizing a Christian organization's activities, including a Bible lesson and memorization of Bible verses, as "religious activity"); *Lee v. Weisman,* 505 U.S. 577, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (noting Establishment Clause precedents dealing with "prayer *and* religious exercise") (emphasis added); *Sch. Dist. of Abington Township v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (char-

acterizing activity including the selection and reading of Bible verses and recitation of the Lord's Prayer as "religious ceremony"). To suggest that a pledge to a country "under God" does not constitute a religious activity might seem to denigrate the importance and sanctity of the belief in God held by many. Indeed, it is the conjunction of religion and the state that affronts Myers' deeply-held religious convictions and the teachings of his Anabaptist Mennonite faith.

Second, the statute at issue, requiring daily recitation of the Pledge in public elementary school classrooms, might be seen as offending the principle of neutrality that undergirds the Establishment Clause. The Court recently again reaffirmed that "the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. Am. Civil Liberties Union,* — U.S. —, at —, 125 S.Ct. 2722, 2733, 162 L.Ed.2d 729, 2005 WL 1498988, at *10 (June 27, 2005) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). The government cannot "force a person to profess a belief or disbelief in any religion." *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (internal quotation marks omitted). Yet, by invoking "one Nation under God," the Pledge certainly raises the specter of religion, implicating concerns about the government's neutrality.

Because the phrase "under God" does "entail an affirmation that God exists," *Newdow,* 124 S.Ct. at 2329 (Thomas, J., concurring in the judgment), it may be "anathema to those who reject God's existence." *Van Orden v. Perry,* — U.S. —, at —, 125 S.Ct. 2854, 2866, 162 L.Ed.2d 607, 2005 WL 1500276, at *9 (June 27, 2005) (Thomas, J., concurring). Moreover, the nonreligious may not be the

only people offended by this affirmation. The Supreme Court has long recognized that some religions practiced in this country "do not teach what would generally be considered a belief in the existence of God." *Torcaso*, 367 U.S. at 495 n. 11, 81 S.Ct. 1680; *see also Van Orden*, —— U.S. ——, at —— & n. 18, 125 S.Ct. 2854, 2880–81 & n. 18, 162 L.Ed.2d 607, 2005 WL 1500276, at *20 & n. 18 (Stevens, J., dissenting). So, requiring recitation of the Pledge, with its invocation of a monotheistic God, might well be seen as both favoring religion over nonreligion and "prefer[ring]" one religious tradition over others. *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

However, the Justices of the Supreme Court have stated, repeatedly and expressly, that the Pledge of Allegiance's mention of God does not violate the First Amendment. I would affirm the district court's judgment solely on the basis of this considerable authority.