JANE DOE[1] & others[2] vs. ACTON-BOXBOROUGH REGIONAL
SCHOOL DISTRICT & others.[3]

Middlesex. September 4, 2013. - May 9, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Constitutional Law,* Equal protection of laws, Equal Rights Amendment,
Education. *School and School Committee,* Regional school district.

Discussion of the history of the pledge of allegiance (pledge) and of Federal
    case law concluding that recitation of the pledge is a fundamentally patriotic
    exercise, not a religious one. [69-72]
Statement that no Massachusetts school student is required by law to recite
    the pledge of allegiance (pledge) or to participate in the ceremony of
    which the pledge is a part. [72-74]
In a civil action challenging the practice by which the pledge of allegiance
    (pledge) is recited each morning in the defendant town public schools and
    in the defendant regional school district, on the ground that daily recitation
    of the pledge violated the rights of the plaintiffs (who are atheists and
    Humanists) under art. 1 of the Massachusetts Declaration of Rights, as
    amended by art. 106 of the Amendments to the Massachusetts Constitu-
    tion, because the pledge includes the words "under God," the judge properly
    granted summary judgment in favor of the defendants, where there was no
    classification (let alone a suspect classification based on religion) created
    by the defendants' practice of reciting the pledge in a voluntary manner,
    and where, given that there was no evidence in the summary judgment rec-
    ord of the plaintiffs' children having been treated (by school administra-
    tors, teachers, staff, fellow students, or anyone else) any differently from

[1]Individually and as mother and next friend of her three children, who are
students in the defendants' schools.

[2]John Doe, individually and as father and next friend of his three children;
and the American Humanist Association. The association is a nationwide
organization, with more than 120 chapters and affiliates and more than 20,000
members, "that promotes Humanism and defends the rights of Humanists and
other non-theistic individuals."

[3]Town of Acton public schools and the superintendent of schools of Acton
and the Acton-Boxborough regional school district; Daniel Joyce and Ingrid
Joyce, individually and as parents and next friends of their two children, who
are students in the defendants' schools, interveners; and Knights of Columbus,
interveners. The Knights of Columbus is an incorporated lay Catholic fraternal
organization with more than 1.8 million members worldwide. For clarity, we
refer to the original defendants as "the defendants" and the Joyces and
Knights of Columbus as "the interveners."

other children because of their religious beliefs or because of how they participated in the pledge, or of them having been perceived any differently for those reasons, the plaintiffs' claim of stigma was not cognizable under art. 106. [74-83] LENK, J., concurring.

In a civil action challenging the practice by which the pledge of allegiance (pledge) is recited each morning in the defendant town public schools and in the defendant regional school district, on the ground that daily recitation of the pledge, which includes the words "under God," violated the rights of the plaintiffs (who are atheists and Humanists) under G. L. c. 76, § 5, which prohibits discrimination in public schools on account of, inter alia, religion, the judge properly granted summary judgment in favor of the defendants, where the defendants conferred no privilege or advantage of patriotism within the meaning of the statute to those who recite the pledge in its entirety. [83]

CIVIL ACTION commenced in the Superior Court Department on November 10, 2010.

The case was heard by *S. Jane Haggerty*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Eric C. Rassbach*, of the District of Columbia (*Diana M. Verm*, of the District of Columbia, & *J. Patrick Kennedy* with him) for the interveners.

*Geoffrey R. Bok* for the defendants.

*David A. Niose* for the plaintiffs.

The following submitted briefs for amici curiae:

*Andrew P. Blake, David S. Petron, Judith C. Gallagher, & Christopher R. Mills*, of the District of Columbia, for Steven Palazzo & others.

*David A. Cortman*, of Georgia, *Jeremy D. Tedesco*, of Arizona, & *Andrew D. Beckwith* for Alliance Defending Freedom & another.

*Jay Alan Sekulow, Stuart J. Roth, & Colby M. May*, of the District of Columbia, *Erik M. Zimmerman*, of Virginia, & *Carly F. Gammill*, of Tennessee, for American Center for Law and Justice.

*Ronald A. Lindsay & Karla Grossenbacher*, of the District of Columbia, for Center for Inquiry.

*Thomas R. McCarthy & Brendan J. Morrissey*, of the District

of Columbia, *Kelly J. Shackelford & Hiram S. Sasser, III*, of Texas, *& Gregory D. Cote* for The American Legion & another.

*Martha Coakley*, Attorney General, *& Amy Spector*, Assistant Attorney General, for the Commonwealth.

IRELAND, C.J. This case presents two questions of State constitutional and statutory law: first, whether the daily recitation of our Nation's pledge of allegiance (pledge) in the defendants' schools violates the plaintiffs' equal protection rights under the Massachusetts Constitution, because the pledge includes the words "under God"; and second, whether the recitation of the pledge violates G. L. c. 76, § 5, which prohibits discrimination in Massachusetts public school education. We hold that the recitation of the pledge, which is entirely voluntary, violates neither the Constitution nor the statute.

1. *Procedural background.* The plaintiffs, Jane Doe and John Doe, commenced this action in the Superior Court challenging the practice by which the pledge is recited each morning in the public schools of the town of Acton and the Acton-Boxborough regional school district. The plaintiffs and their children are both atheists and Humanists.[4] They alleged, among other things, that the daily recitation of the pledge violated their rights under the Massachusetts Constitution — specifically, art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments (art. 106)[5] — because the pledge includes the words "under God." They also alleged that the recitation of the pledge violated G. L. c. 76, § 5.[6,7] They sought declaratory and injunc-

---

[4] The plaintiffs describe atheism in their complaint, and in affidavits in support of their summary judgment motion, as "a religious view" that does "not accept the existence of any type of God or gods." They describe Humanism as "a broader religious world view that includes, in addition to a non-theistic view on the question of deities, an affirmative naturalistic outlook; an acceptance of reason, rational analysis, logic, and empiricism as the primary means of attaining truth; an affirmative recognition of ethical duties; and a strong commitment to human rights."

[5] Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments (art. 106), commonly referred to as the equal rights amendment, states, in relevant part, that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

[6] General Laws c. 76, § 5, provides, in relevant part, that "[n]o person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of

tive relief, including a declaration that the daily, in-school recitation of the pledge in its current form, including the words "under God," violated their State constitutional and statutory rights; an order enjoining the defendants from continuing with the pledge in its current form or in any form that includes affirmations as to the existence or nonexistence of a deity; and a declaration that the recitation of a form of the pledge with the words "under God" omitted would not violate the Massachusetts Constitution or G. L. c. 76, § 5.[8]

All parties moved for summary judgment. A judge in the Superior Court granted the motions of the defendants and the interveners and denied the plaintiffs' motion. The plaintiffs appealed. We granted their application for direct appellate review, which was supported by the defendants and interveners.[9]

2. *Facts.* The following facts are drawn from the summary judgment record, which in this case included numerous affidavits filed by both sides. No party contended that there were any genuine issues of material fact that precluded the granting of summary judgment.

The pledge is recited in the defendants' schools on a daily basis. The language of the pledge states: "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with

such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation."

[7]The plaintiffs also alleged in their complaint that the recitation of the pledge of allegiance (pledge) violated the schools' nondiscrimination policy. They no longer press this claim.

[8]The American Humanist Association sought essentially the same relief in this case as the individual plaintiffs did. The individual plaintiffs, Jane Doe and John Doe, are members of the association. Because it is clear that the individual plaintiffs have standing to pursue their claims, asserting their rights individually and the rights of their children, we need not consider whether the association, by itself, has standing to bring the types of claims made in the case. See *Tax Equity Alliance for Mass., Inc.* v. *Commissioner of Revenue*, 401 Mass. 310, 314 (1987).

[9]We acknowledge receipt of the briefs submitted by the following amici curiae: Alliance Defending Freedom and Massachusetts Family Institute; American Center for Law and Justice; Center for Inquiry; The American Legion and The American Legion Department of Massachusetts; Steven Palazzo, Mike McIntyre, and thirty-six other members of the United States House of Representatives; and the Commonwealth.

liberty and justice for all." This language is codified at 4 U.S.C. § 4 (2012).[10] The pledge was first codified in 1942, but at that time it did not include the words "under God." Those words were added to the statute in 1954, in circumstances we shall describe below.

The pledge is recited in the defendants' schools, and in schools across Massachusetts, pursuant to G. L. c. 71, § 69, which provides, in relevant part, that "[e]ach teacher at the commencement of the first class of each day in all grades in all public schools shall lead the class in a group recitation of the 'Pledge of Allegiance to the Flag.' " The parties do not dispute that the flag ceremony, of which the pledge is a part, is intended to instill values of patriotism and good citizenship. Although the statute purports to impose a monetary fine on teachers who fail to lead the pledge, the parties do not dispute that the defendants' school administration does not require participation by teachers or students. The school superintendent, in his affidavit, avers that "[f]or both students and teachers, participation in the Pledge of Allegiance is totally voluntary. Any teacher or student may abstain themselves from participation in the Pledge of Allegiance for any or no reason, without explanation and without any form of recrimination or sanction."

At the time the parties filed their cross motions for summary judgment, the Does' three children were fourteen, twelve, and ten years old. They acknowledged in their affidavits[11] that "[they] understand that [they] have the right to refuse to participate in the flag-salute ceremony, but [they] want to participate in it." They also acknowledged that "[i]n fact, usually when [their] class[es] say[] the Pledge [they] do participate in the ceremony (although [they] usually do not say the 'under God' words)." The children, as atheists and Humanists, "do not believe that

---

[10]The statute provides: "The Pledge of Allegiance to the Flag: 'I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.', should be rendered by standing at attention facing the flag with the right hand over the heart. When not in uniform men should remove any nonreligious headdress with their right hand and hold it at the left shoulder, the hand being over the heart. Persons in uniform should remain silent, face the flag, and render the military salute."

[11]Each child filed an affidavit in support of the plaintiffs' motion for summary judgment. The affidavits are for all intents and purposes identical.

the United States of America or any other country is 'under God.' " They stated that they believe that the pledge, as recited in their schools, "suggests that all good Americans believe in God" and that others, like them, "who don't believe in God, aren't as good as others who do believe." Jane Doe and John Doe, in their affidavits, likewise expressed concern that the re-citation of the pledge "marginalizes [their] children and [their] family and reinforces [a] general public prejudice against atheists and Humanists, as it necessarily classifies [them] as outsiders, defines [them] as second-class citizens, and even suggests that [they are] unpatriotic." They claimed that "[i]t is inappropriate for [their] children to have to draw attention to themselves by not participating, possibly leading to unwanted attention, criticism and potential bullying," and that at their children's ages, " 'fit-ting in' is an important psychological need." As the motion judge noted in her memorandum of decision, however, there is no evidence in the summary judgment record that the Doe children have ever been subjected to any type of punishment, bullying or other mistreatment, criticism, condemnation, or ostracism as a result of not participating in the pledge or not reciting the words "under God."

3. *Discussion.* a. *History.* We begin with a short overview of the history of the pledge. As many courts have concluded, the pledge is a fundamentally patriotic exercise, not a religious one.

The pledge first appeared in 1892 in a nationally circulated magazine for American youths. *Elk Grove Unified Sch. Dist.* v. *Newdow,* 542 U.S. 1, 6 (2004). Its timing coincided with the 400th anniversary of Christopher Columbus's arrival in America, and with a nationwide interest in commemorating that historic occasion. *Id.* The magazine proposed that students recite the following words as part of a flag-salute ceremony that would take place in the Nation's schools, designed to instill a sense of national unity and patriotism: "I pledge allegiance to my Flag and the Republic for which it stands: one Nation indivisible, with Liberty and Justice for all." *Id.* The phrase "one Nation indivisible" was particularly meaningful at that time, in light of the fact that the country had, in its recent past, fought and

survived the Civil War with the national unity intact.[12] *Id.* at 6 n.1.

The pledge was first adopted by Congress in 1942, during World War II. *Id.* at 6, citing Pub. L. No. 77-623, 77th Cong., c. 435, § 7, 56 Stat. 377 (1942).[13] The pledge was one part of a joint Congressional resolution establishing "a detailed set of 'rules and customs pertaining to the display and use of the flag of the United States of America.' " *Elk Grove Unified Sch. Dist., supra* at 6, quoting Pub. L. No. 77-623. "This resolution, which marked the first appearance of the Pledge of Allegiance in positive law, confirmed the importance of the flag as a symbol of our Nation's indivisibility and commitment to the concept of liberty." *Elk Grove Unified Sch. Dist., supra* at 7.

In 1954, Congress amended the pledge to include the words "under God." *Id.* See Pub. L. No. 83-396, 83d Cong., 2d Sess., c. 297, 68 Stat. 249 (1954). The amendment came during the escalation of the Cold War, and there is some indication in the legislative history that the amendment was intended to underscore that the American form of government was "founded on the concept of the individuality and the dignity of the human being," which is grounded in "the belief that the human person is important because he was created by God and endowed by Him with certain inalienable rights which no civil authority may usurp." H.R. Rep. No. 1693, 83d Cong., 2d Sess., at 1-2 (1954). The House Report acknowledges that "[f]rom the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God." *Id.* at 2. The report identifies a number of historical statements and documents of the founding fathers and subsequent national leaders that refer expressly to

---

[12]According to the amicus brief of the American Legion and the American Legion Department of Massachusetts, the text of the pledge underwent minor changes in 1923 and 1924. In 1923, the American Legion and other groups participated in the first National Flag Conference, which voted to change the phrase "my Flag" to "the flag of the United States," and in the following year, the Flag Conference approved another small change, the addition of the words "of America" after the reference to the United States.

[13]The text of the pledge at that time was as follows: "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with Liberty and Justice for all." *Elk Grove Unified Sch. Dist.* v. *Newdow,* 542 U.S. 1, 6 (2004).

"God," "Nature's God," the "Creator," and like terms, and that reflect an understanding that the Nation was founded on a belief in God, including the Mayflower Compact, the Declaration of Independence, and the Gettysburg Address. *Id.* at 2-3.[14,15] See *School Dist. of Abington Township* v. *Schempp*, 374 U.S. 203, 213 (1963) ("The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself"); *Newdow* v. *Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1032, 1038 (9th Cir. 2010) ("The words 'under God' were added as a description of 'one Nation' primarily to reinforce the idea that our nation is founded upon the concept of a limited government, in stark contrast to the unlimited power exercised by communist forms of government"; "A reasonable observer . . . aware of the history and origins of the words in the Pledge would view the Pledge as a product of this nation's history and political philosophy").[16]

---

[14]Similarly, the Massachusetts Constitution contains references to "God," "the Supreme Being," and the "great Creator and preserver of the Universe." See, e.g., art. 2 of the Massachusetts Declaration of Rights.

[15]Likewise, in 2002, Congress reaffirmed the pledge as amended in 1954, in response to the decision of a panel of the United States Court of Appeals for the Ninth Circuit in *Newdow* v. *U.S. Congress*, 292 F.3d 597, 600, 612 (9th Cir. 2002) (2-1 decision holding unconstitutional a California school district policy and practice of teacher-led voluntary recitation of pledge), *S.C.*, 328 F.3d 466 (9th Cir. 2003), rev'd sub nom. *Elk Grove Unified Sch. Dist.* v. *Newdow*, 542 U.S. 1 (2004). See Pub. L. No. 107-293, 107th Cong., 2d Sess., §§ 1-2, 116 Stat. 2057-2060 (2002). The 2002 act, like its 1954 predecessor, contained extensive congressional findings about the Nation's religious heritage, including a recitation of various historic documents and statements of the founding fathers and subsequent national leaders that referred to "God" and "the Creator," and a synopsis of numerous decisions of the United States Supreme Court that have referred favorably to the pledge and other references to God as part of our national heritage. See H.R. Rep. 659, 107th Cong., 2d Sess. (2002). See also *Elk Grove Unified Sch. Dist.*, *supra* at 26-30 (Rehnquist, C.J., concurring) (identifying numerous "[e]xamples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history").

[16]Although the Federal statute sets forth the language of the pledge, it says nothing about its recitation in public schools or elsewhere. As stated earlier, the pledge is recited in Massachusetts schools pursuant to G. L. c. 71, § 69. The plaintiffs point to nothing in the legislative history of the Massachusetts statute suggesting that it, or any of its amendments throughout the years, was motivated by religious concerns.

Although the words "under God" undeniably have a religious tinge, courts that have considered the history of the pledge and the presence of those words have consistently concluded that the pledge, notwithstanding its reference to God, is a fundamentally patriotic exercise, not a religious one. See, e.g., *Elk Grove Unified Sch. Dist.*, 542 U.S. at 6 ("As its history illustrates, the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles"); *Newdow* v. *Rio Linda Union Sch. Dist.*, 597 F.3d at 1014 ("We hold that the Pledge of Allegiance does not violate the Establishment Clause [of the First Amendment to the United States Constitution] because Congress' ostensible and predominant purpose was to inspire patriotism and that the context of the Pledge — its wording as a whole, the preamble to the statute, and this nation's history — demonstrate that it is a predominantly patriotic exercise. For these reasons, the phrase 'one Nation under God' does not turn this patriotic exercise into a religious activity"); *Myers* v. *Loudon County Pub. Sch.*, 418 F.3d 395, 407 (4th Cir. 2005) (distinguishing constitutional challenge to pledge from school prayer cases because of "the simple fact that the Pledge, unlike prayer, is not a religious exercise or activity, but a patriotic one"; stating that inclusion of words "under God," despite their religious significance, "does not alter the *nature* of the Pledge as a patriotic activity"). It is principally for that reason that all the Federal appellate courts that have considered a First Amendment challenge to the voluntary recitation of the pledge in public schools, with the words "under God," have held the practice to be constitutional. See *Freedom From Religion Found.* v. *Hanover Sch. Dist.*, 626 F.3d 1, 4-5 (1st Cir. 2010), cert. denied, 131 S. Ct. 2292 (2011); *Croft* v. *Perry*, 624 F.3d 157, 162-163 (5th Cir. 2010); *Newdow* v. *Rio Linda Union Sch. Dist.*, *supra* at 1042; *Myers*, *supra* at 408; *Sherman* v. *Community Consol. Sch. Dist. 21 of Wheeling Township*, 980 F.2d 437, 439-440 (7th Cir. 1992), cert. denied, 508 U.S. 950 (1993).[17]

b. *Voluntary recitation.* It is undisputed, as a matter of Federal

---

[17]The Supreme Court has not yet expressly decided whether a voluntary recitation of the pledge in public schools is constitutional. That said, the

constitutional law and as a matter of fact on the summary judg-
ment record before us, that no student is required to recite the
pledge.

The statute that calls for the daily recitation of the pledge in
Massachusetts schools, G. L. c. 71, § 69, on its face imposes no
affirmative requirement on students to participate. It purports, at
most, to require teachers to lead a daily recitation of the pledge,
a requirement that is itself of doubtful constitutional legitimacy.
See *Opinions of the Justices*, 372 Mass. 874 (1977). In the
seminal case of *West Virginia State Bd. of Educ.* v. *Barnette*,
319 U.S. 624 (1943), the United States Supreme Court con-
sidered a claim that the mandatory recitation of the pledge by
school students violated the First Amendment. The plaintiffs in
that case were Jehovah's Witnesses who objected on free speech
and free exercise grounds to both a mandatory salute to the flag
and a mandatory recitation of the pledge required by the State
board of education. *Id.* at 629-630. The Court held that the
mandatory salute and pledge violated the plaintiffs' First Amend-
ment rights.[18] *Id.* at 642.

---

Court, in dicta, and its individual Justices have repeatedly referred to the
pledge favorably. See *Myers* v. *Loudon County Pub. Sch.*, 418 F.3d 395, 405
(4th Cir. 2005) (observing that "in every case in which the Justices of the
Court have made mention of the Pledge, it has been as an assurance that the
Pledge is not implicated by the Court's interpretation of the Establishment
Clause"), and cases cited. For the most recent example of this, see *Greece* v.
*Galloway*, 134 S. Ct. 1811, 1825 (2014) (plurality opinion of Kennedy, J.); *id.*
at 1853 (Kagan, J., dissenting).

In the *Elk Grove* case, three Justices wrote separately to address the substan-
tive merits of the challenge made to the pledge in that case; although their
opinions demonstrate differing views of jurisprudence arising under the First
Amendment to the United States Constitution, the opinions also illustrate that
under any of the jurisprudential views that are espoused there, a voluntary
recitation of the pledge in the Nation's public schools would withstand a First
Amendment attack. See *Elk Grove Unified Sch. Dist.*, 542 U.S. 1, 18, 30
(2004) (Rehnquist, C.J., concurring); *id.* at 33, 43 (O'Connor, J., concurring);
*id.* at 45, 47 (Thomas, J., concurring). No Justice of the Supreme Court, in the
*Elk Grove* case or in any other case, has suggested that the future of the
pledge as part of our Nation's public school curriculum is in peril. See *Myers*,
*supra* at 406 (finding it "noteworthy that, given the vast number of Establish-
ment Clause cases to come before the Court, *not one Justice has ever sug-
gested that the Pledge is unconstitutional.* In an area of law sometime marked
by befuddlement and lack of agreement, such unanimity is striking").

[18]The speech and religion claims that were successfully asserted by the
plaintiffs in that case did not concern the words "under God," as those words,

The *Barnette* decision sounded the death knell for any statute, governmental regulation, or policy that purports to impose a requirement on students to recite the pledge. The Attorneys General of this Commonwealth have long recognized this to be the case. See Opinion of the Attorney General, Rep. A.G., Pub. Doc. 12 at 170 n.1 (1977); Opinion of the Attorney General, Rep. A.G., Pub. Doc. 12 at 106 (1970); Opinion of the Attorney General, Rep. A.G., Pub. Doc. 12 at 243 (1965); Opinion of the Attorney General, Rep. A.G., Pub. Doc. 12 at 64 (1943). The individual Justices of this court likewise have recognized it to be true. See *Opinions of the Justices*, 372 Mass. at 880 ("We think it is clear from the opinion of the Supreme Court of the United States in the *Barnette* case that no punishment of any kind may be imposed on a student who elects, as a matter of principle, to abstain from participation"); *id.* at 881 ("it is clear that no such decision [requiring a student to participate in the recitation of the pledge and punishing noncompliance] could be made today"). Although this court has not been called on previously to so state, we take this opportunity to confirm what has been obvious and understood to be the case for the decades since the *Barnette* case was decided: no Massachusetts school student is required by law to recite the pledge or to participate in the ceremony of which the pledge is a part. Recitation of the pledge is entirely optional. Students are free, for any reason or for no reason at all, to recite it in its entirety, not recite it at all, or recite or decline to recite any part of it they choose, without fear of punishment.

c. *Analysis under the equal rights amendment.* The plaintiffs' constitutional claim in this case is very limited. They do not claim that the practice of reciting the pledge violates their religious rights under the establishment or free exercise clauses of the First Amendment, or under cognate provisions of the Massachusetts Constitution. Nor do the plaintiffs make any other claim under the Federal Constitution. Their sole constitutional claim is an equal protection claim brought pursuant to the equal rights amendment, art. 106.

The plaintiffs rely on our recent decision in *Finch* v. *Com-*

at that time, were not part of the pledge. *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 628-629 (1943).

*monwealth Health Ins. Connector Auth.*, 459 Mass. 655 (2011), *S.C.*, 461 Mass. 232 (2012), for the proposition that the recitation of the pledge is subject to strict scrutiny in Massachusetts because it discriminates against them on the basis of a classification identified in art. 106, i.e., their religion.[19] The *Finch* decision reaffirmed that "[t]he classifications set forth in art. 106 [(sex, race, color, creed, or national origin)] . . . are subjected to the strictest judicial scrutiny." *Id.* at 662, quoting *Commonwealth* v. *King*, 374 Mass. 5, 21 (1977). See *Animal Legal Defense Fund, Inc.* v. *Fisheries & Wildlife Bd.*, 416 Mass. 635, 640 (1993) ("Classifications based on sex, race, color, creed or national origin are considered suspect"). "Effectively, art. 106 removes the first step — determination whether a classification is suspect — from equal protection analysis and mandates strict scrutiny of the enumerated classifications." *Finch, supra,* citing *King, supra.* Thus, if the practice of reciting the pledge did in fact single out the plaintiffs and treat them differently from others in any legally cognizable way (in other words, create a "classification") because of their religious beliefs, their argument might be commendable. The flaw in the argument, however, is that there is no classification, let alone a suspect classification based on religion, created by the practice of reciting the pledge in the manner it is presently recited, voluntarily.

Classification, and differing treatment based on a classification, are essential components of any equal protection claim, Federal or State. See *Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985), citing *Plyer* v. *Doe*, 457 U.S. 202, 216 (1982) (equal protection mandate "is essentially a direction that all persons similarly situated should be treated alike"); *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 59-60 (1973) (Stewart, J., concurring) ("The function of the Equal Protection Clause . . . is simply to measure the validity of *classifications* created by state laws. There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation

---

[19]Article 106 does not expressly mention religion. See note 5, *supra*. The plaintiffs treat the word "creed," which is found in art. 106, as synonymous with "religion." Neither the parties nor any of the amici claim that the difference in terminology is significant for present purposes, and we find no reason to differentiate between those terms here.

whose purpose or effect is to create discrete and objectively identifiable classes"); *Wirzburger* v. *Galvin*, 412 F.3d 271, 283 (1st Cir. 2005), cert. denied, 546 U.S. 1150 (2006) (provisions of art. 48, The Initiative, II, § 2, of Amendments to Massachusetts Constitution, which exclude from initiative petition process any measure related to "religion, religious practices or religious institutions," or which concern art. 18, as amended by arts. 46 and 103 of Amendments to Massachusetts Constitution, the so-called anti-aid amendment, "do not require different treatment of any class of people because of their religious beliefs. . . . In short, this is not the classic violation of equal protection in which a law creates different rules for distinct groups of individuals based on a suspect classification"). See also *Finch, supra* at 676 ("[T]he right to equal protection recognizes that the act of classification is itself invidious and is thus constitutionally acceptable only where it meets an exacting test"); *Matter of Corliss*, 424 Mass. 1005, 1006 (1997), citing *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 415 Mass. 218, 226 (1993), *S.C.*, 418 Mass. 165 (1994) ("One indispensable element of a valid equal protection claim is that individuals who are similarly situated have been treated differently").[20] Here there is no discriminatory classification for purposes of art. 106 — no differing treatment of any class or classes of students based on their sex, race, color, creed, or national origin. All students are treated alike. They are free, if they choose, to recite the pledge or any part of it that they see fit. They are entirely free as well to choose to abstain. No one is required to say all or even any part of it. And significantly, no student who abstains from reciting the pledge, or any part of it, is required to articulate a reason for his or her choice to do so.

The United States Court of Appeals for the First Circuit recently considered a similar claim under the Federal equal protection clause. In *Freedom From Religion Found.* v. *Hanover*

---

[20]See also E. Chemerinsky, Constitutional Law; Principles and Policies § 9.1.2, at 685-686 (4th ed. 2011) ("All equal protection cases pose the same basic question: Is the government's classification justified by a sufficient purpose? . . . The first question [in equal protection analysis therefore] is: What is the government's classification? How is the government drawing a distinction among people? Equal protection analysis always must begin by identifying how the government is distinguishing among people").

*Sch. Dist.*, 626 F.3d at 4-5 & nn.6 & 7, the plaintiffs claimed that a voluntary recitation of the pledge in the New Hampshire public schools violated their rights because they were atheists and agnostics who objected to the inclusion of the words "under God" in the pledge. They claimed that the pledge discriminated against them on account of their religious views. *Id.* at 5 n.6. The court disposed of the equal protection claim in short order, concluding that the New Hampshire pledge statute, which expressly made the recitation of the pledge voluntary, did not treat any class or classes of students differently:

> "Under the Equal Protection Clause of the Fourteenth Amendment [to the United States Constitution], the Constitution 'guarantees that those who are similarly situated will be treated alike.' *In re Subpoena to Witzel*, 531 F.3d 113, 118 (1st Cir. 2008). Invoking the Equal Protection Clause, [the plaintiffs contend] that the School Districts have a duty to show equal respect for [their] atheist and agnostic beliefs, that they are in breach of this duty by leading students in affirming that God exists, and that they created a social environment that perpetuates prejudice against atheists and agnostics. However, the New Hampshire Act does 'not require different treatment of any class of people because of their religious beliefs,' nor does it 'give preferential treatment to any particular religion.' *Wirzburger* v. *Galvin*, 412 F.3d 271, 283 (1st Cir. 2005). Rather, as the district court found, 'it applies equally to those who believe in God, those who do not, and those who do not have a belief either way, giving adherents of all persuasions the right to participate or not participate in reciting the pledge, for any or no reason.' *Freedom From Religion Found.* v. *Hanover School Dist.*, 665 F. Supp. 2d 58, 72 (D. N.H. 2009). Therefore, [the plaintiffs'] equal protection claim fails."

*Freedom From Religion Found., supra* at 14.

In an earlier section of its opinion, the First Circuit addressed the plaintiffs' claim that the recitation of the pledge also violated the First Amendment's establishment clause, because its inclusion of the words "under God" effectively constituted an impermissible State endorsement of theistic religions. *Id.* at 6-14.

Although the plaintiffs in this case are *not* asserting an establishment clause claim, or for that matter any claim under the Federal Constitution, we find one part of the court's discussion of that claim particularly instructive on the equal protection claim that we have here. The plaintiffs in that case, similar to the plaintiffs here, maintained that the recitation of the pledge would effectively cast them as outsiders. *Id.* at 10. As part of its discussion of the so-called endorsement mode of analysis,[21] the First Circuit acknowledged the principle that "[a] practice in which the [S]tate is involved may not 'send[] the ancillary message to members of the audience who are nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." ' " *Id.*, quoting *Santa Fe Indep. Sch. Dist.* v. *Doe*, 530 U.S. 290, 309-310 (2000). The court rejected the plaintiffs' claim that such a message is sent when the pledge is recited voluntarily:

> "At the heart of [the] claim is [the] argument that those students who choose not to recite the Pledge for reasons of nonbelief in God are quite visibly differentiated from other students who stand and participate. The result, [the plaintiffs argue,] is that the recitation of the Pledge makes the Doe children outsiders to their peer group on the grounds of their religion.

> "[The plaintiffs'] premise is that children who choose not to recite the Pledge become outsiders based on their beliefs about religion. That premise is flawed. Under the New Hampshire Act, both the choice to engage in the recitation in the Pledge and the choice not to do so are entirely voluntary. The reasons pupils choose not to participate are not themselves obvious. There are a wide variety of reasons why students may choose not to recite the Pledge, including many reasons that do not rest on either religious or anti-religious belief. These include politi-

---

[21]"Under the . . . endorsement analysis, courts must consider whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion." *Freedom From Religion Found.* v. *Hanover Sch. Dist.*, 626 F.3d 1, 10 (1st Cir. 2010), cert. denied, 131 S. Ct. 2292 (2011), citing *County of Allegheny* v. *American Civ. Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 593-594 (1989).

> cal disagreement with reciting the Pledge, a desire to be different, a view of our country's history or the significance of the flag that differs from that contained in the Pledge, and no reason at all. Even students who agree with the Pledge may choose not to *recite* the Pledge. Thus, the Doe children are not *religiously* differentiated from their peers merely by virtue of their non-participation in the Pledge."

*Freedom From Religion Found.*, 626 F.3d at 10-11. The same can be said of the plaintiffs' art. 106 claim in this case. Participation is entirely voluntary; all students are presented with the same options; and one student's choice not to participate because of a religiously held belief is, as both a practical and a legal matter, indistinguishable from another's choice to abstain for a wholly different, more mundane, and constitutionally insignificant reason.

The plaintiffs nevertheless press the claim that the children are adversely affected by the recitation of the pledge because of their religious views. They claim to be "stigmatize[d]" and "marginalized," and to "feel excluded," when the pledge is recited by others, regardless of whether they participate. Specifically, they contend that having the pledge with the words "under God" recited in their schools effectively conveys a message that persons, like them, who do not believe that the Nation is "under God" are "outsiders," "second-class citizens," and "unpatriotic."

The plaintiffs do not appear to be claiming that their children have been punished, bullied, criticized, ostracized, or otherwise mistreated by anyone as a result of their decision to decline to recite some (or all) of the pledge. There is no evidence in the summary judgment record that the plaintiffs' children have in fact been *treated* by school administrators, teachers, staff, fellow students, or anyone else any differently from other children because of their religious beliefs, or because of how they participate in the pledge. Nor is there any evidence that they have in fact been *perceived* any differently for those reasons. The plaintiffs do identify what they claim is a poor public perception of atheists in general, and they maintain that their children's failure to recite the pledge in its entirety may "possibly" lead to "unwanted attention, criticism, and potential

bullying." However, there is nothing in the record indicating that this has in fact happened to the plaintiffs' children or to any other Massachusetts schoolchildren because of their decision to exercise their right not to recite the words "under God" in the pledge.[22] In short, there is nothing empirical or even anecdotal in the summary judgment record to support a claim that the children actually have been treated or perceived by others as "outsiders," "second-class citizens," or "unpatriotic."

The plaintiffs' claim of stigma is more esoteric. They contend that the mere recitation of the pledge in the schools is itself a public repudiation of their religious values and, in essence, a public announcement that they do not belong. It is this alleged repudiation that they say causes them to feel marginalized, sending a message to them and to others that, because they do not share all the values that are being recited, they are "unpatriotic" "outsiders." We hold that this very limited type of consequence alleged by the plaintiffs — feeling stigmatized and excluded — is not cognizable under art. 106.[23]

The fact that a school or other public entity operates a voluntary

---

[22]The plaintiffs cite an incident in Rhode Island in which an atheist high school student was treated hostilely by fellow students (and others in the community) who objected to her public campaign and (ultimately successful) litigation to force the city to remove a "prayer mural" from the school auditorium. It suffices to say that the circumstances of that case are readily distinguishable from what is before us, and we therefore decline to consider it. See *Ahlquist* v. *Cranston*, 840 F. Supp. 2d 507 (D.R.I. 2012).

[23]A typical equal protection claim under art. 106 alleges that someone has actually been *treated* unequally compared to others similarly situated — e.g., deprived of an available legal right or benefit, saddled with a penalty, or has otherwise had his or her legal rights or duties impinged — without the requisite constitutionally supportable justification. See, e.g., *Finch* v. *Commonwealth Health Ins. Connector Auth.*, 461 Mass. 232, 233 (2012) (claiming that qualified aliens were denied State subsidies for purchase of health insurance); *Elroy E.* v. *Commonwealth*, 459 Mass. 1, 4 (2011) (claiming that petitioner was denied benefit of judicial hearing on relief from registration under Sex Offender Registration and Community Notification Act); *Commonwealth* v. *Weston W.*, 455 Mass. 24, 25 (2009) (claiming that city's "youth protection curfew" interfered with juveniles' constitutional right of free movement); *Brackett* v. *Civil Service Comm'n*, 447 Mass. 233, 234 (2006) (claiming that plaintiffs were impermissibly bypassed for job promotions); *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 312 (2003) (claiming that same-sex couples were denied right to civil marriage). The plaintiffs nevertheless claim that stigmatization alone can sometimes constitute a cognizable injury, without a corresponding loss or denial of some type of benefit, imposition of

program or offers an activity that offends the religious beliefs of one or more individuals, and leaves them feeling "stigmatized" or "excluded" as a result, does not mean that the program or activity necessarily violates equal protection principles. If we were to accept the plaintiffs' theory, numerous programs and activities that are otherwise constitutional would be scuttled under the rubric of equal protection. For example, in *Curtis* v. *School Comm. of Falmouth*, 420 Mass. 749, 750, 760 (1995), cert. denied, 516 U.S. 1067 (1996), we upheld a program adopted by the town of Falmouth school committee that made condoms available to students in the junior and senior high schools in Falmouth. We rejected the claims of parents and students that the program violated their constitutional rights to familial privacy and parental control of their children's education and upbringing, as well as their right to the free exercise of religion. *Id.* at 751, 763. If we were to accept the plaintiffs' equal protection theory in this case, the Falmouth program would be vulnerable for essentially the same reason: the plaintiffs in that case could claim that the implementation of the program in the schools — the dispensing of condoms by the school nurse and the presence of condom vending machines in the restrooms — sends a daily message to them that the school accepts and even promotes values that do not comport with their religious views, and therefore publicly renders them "outsiders" based on their religious beliefs. The school condom availability program, which passes muster under the religion provisions of the Federal and State Constitutions, would be struck down under art. 106. A host of other school programs would likewise be vulnerable.[24],[25]

Where the plaintiffs do not claim that a school program or

a penalty, or other interference with one's established legal rights or duties. We need not answer such a broad question. We hold only that the very limited type of "stigma" alleged in this case — the feeling of rejection or exclusion arising from the State's uniform implementation of a voluntary program or activity that is antithetical to one's religious beliefs but which is not shown to violate the First Amendment or cognate provisions of the Massachusetts Constitution — is not actionable.

[24]We disagree with the plaintiffs' suggestion that, for these purposes, there would be a meaningful difference between the voluntary nonparticipation (or partial participation) in the recitation of the pledge, on the one hand, and classroom lessons on human sexual education, homosexuality, evolution,

activity violates anyone's First Amendment religious rights (or cognate rights under the Massachusetts Constitution), they cannot rely instead on the equal rights amendment, and claim that the school's even-handed *implementation* of the program or activity, and the plaintiffs' *exposure* to it, unlawfully discriminates against them on the basis of religion. See *Harris* v. *McRae*, 448 U.S. 297, 322 (1980) ("The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity" [footnote omitted]); *San Antonio Indep. Sch. Dist.*, 411 U.S. at 33 ("It is not the province of [courts] to create substantive constitutional rights in the name of guaranteeing equal protection of the laws"). Where the program or activity is applied equally to all students, and where those who object to it are not required to participate, or may choose to participate in all parts of it that they do not find objectionable, the feeling of "stigma" caused by seeing or hearing the program being provided to others is not legally cognizable for purposes of the equal rights amendment.[26] Any claim that, by conducting the program or activity for others who do

gender equality, and other similar topics, on the other hand. Under the theory of equal protection they have constructed, by offering any constitutionally permissible program or activity the school essentially creates a situation where those who, for protected reasons, elect not to participate can claim that they have been thereby rendered "outsiders" and relegated to an inferior status.

[25]If the plaintiffs are correct, it is difficult to see how the pledge could be recited at all in Massachusetts, even without the words "under God." While the plaintiffs challenge only the inclusion of those words, and appear otherwise content to recite the pledge, any Jehovah's Witness could claim under the plaintiffs' theory that the recitation of the pledge, even without its reference to God, offends his or her religion and thereby impermissibly stigmatizes him or her. See note 18, *supra.* See also *Newdow* v. *Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1036 (9th Cir. 2010) ("To the Jehovah's Witnesses in *Barnette*, even the version of the Pledge that did not contain the words 'under God' violated their religious freedom by causing them to pledge allegiance to something other than God").

[26]Similarly, this type of alleged injury would not be cognizable under the First Amendment. See *Curtis* v. *School Comm. of Falmouth*, 420 Mass. 749, 763 (1995), cert. denied, 516 U.S. 1067 (1996) ("The plaintiffs' argument that the well-known existence of peer pressure in secondary schools adds to the alleged burden on their free exercise rights simply does not rise to the level of constitutional infringement. . . . Although the program may offend the religious sensibilities of the plaintiffs, mere exposure at public schools to offensive programs does not amount to a violation of free exercise. Parents have

choose to participate, the school has publicly repudiated a plaintiff's beliefs and thereby rendered him or her a "second-class citizen" or "outsider" is not tenable, and we decline to apply art. 106 in this fashion.[27]

d. *Analysis under G. L. c. 76, § 5.* Finally, the plaintiffs argue, very briefly, that the recitation of the pledge in the defendants' schools violates G. L. c. 76, § 5. See note 6, *supra.* They cite *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n,* 378 Mass. 342, 344 n.5 (1979) ("With the passage of [the equal rights amendment,] our constitutional law has caught up to § 5"), and appear willing to assume, as we did in that case, that the antidiscrimination provisions of the statute equate with the provisions of art. 106. They argue that, because the daily recitation of the pledge violates art. 106, it also violates § 5. For the same reasons we hold that the pledge does not violate art. 106, however, we also hold that it does not violate the statute. Moreover, as we have stated, reciting the pledge is a voluntary patriotic exercise, but it is not a litmus test for defining who is or is not patriotic. The schools confer no "privilege" or "advantage" of patriotism within the meaning of the statute to those who recite the pledge in its entirety.

no right to tailor public school programs to meet their religious or moral preferences"); *Parker* v. *Hurley,* 514 F.3d 87, 106 (1st Cir.), cert. denied, 555 U.S. 815 (2008) ("Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them"). See also *Elk Grove Unified Sch. Dist.,* 542 U.S. at 32 (Rehnquist, C.J., concurring) ("the mere fact that [one] disagrees with this part of the Pledge does not give him a veto power over the decision of the public schools that willing participants should pledge allegiance to the flag in the manner prescribed by Congress").

[27]We likewise reject the plaintiffs' contention that, when some children choose to exercise their constitutionally protected right not to say the words "under God," there is necessarily conveyed a message that the children are "unpatriotic." Patriotism is not a legal status or benefit that is conferred or withheld by the State, and it is certainly not limited to those who recite the pledge in its entirety. There is no litmus test for patriotism. Schools might conduct patriotic exercises, but they do not define who is and who is not patriotic. See Webster's New World College Dictionary 1056 (4th ed. 2007) (defining patriotism as a "love and loyal or zealous support of one's country").

The case would be different if, for example, the State purported to certify citizens as patriotic (or not) and restricted eligibility for that certification to only those individuals who recite the pledge in its entirety, including the words "under God." Nothing of the sort has happened here.

4. *Conclusion.* The judgment of the Superior Court is affirmed. The judge's declarations that the daily recitation of the pledge of allegiance does not violate art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments, or G. L. c. 76, § 5, are also affirmed.

*So ordered.*

LENK, J. (concurring). I concur in the result and much of the reasoning of the court's opinion. I write separately to note my view that the presence of the phrase "under God" in the pledge of allegiance (pledge) creates a classification that is potentially cognizable under the equal rights amendment of the Massachusetts Constitution, art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments, although not on the record in the present case.

Our opinion rightly notes that recitation of the pledge, in whole or in part, is entirely voluntary. But the logical implication of the phrase "under God" is not diminished simply because children need not say those words aloud. A reference to a supreme being, by its very nature, distinguishes between those who believe such a being exists and those whose beliefs are otherwise. This distinction creates a classification, one that is based on religion. Theists are acknowledged in the text of the pledge, whereas nontheists like the plaintiffs are excluded from that text and are, therefore, implicitly differentiated.

To be sure, as our holding makes clear, the plaintiffs here did not successfully allege that their children receive negative treatment because they opt not to recite the words "under God," or that the inclusion of that phrase in the pledge has occasioned "the creation of second-class citizens." *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 312 (2003). Absent such a showing, the plaintiffs' claim must fail. See *Matter of Corliss*, 424 Mass. 1005, 1006 (1997), citing *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 415 Mass. 218, 226 (1993), *S.C.*, 418 Mass. 165 (1994) (differential treatment is "[o]ne indispensable element of a valid equal protection claim"). But our holding today should not be construed to bar other claims that might

rely on sufficient indicia of harm. Should future plaintiffs demonstrate that the distinction created by the pledge as currently written has engendered bullying or differential treatment, I would leave open the possibility that the equal rights amendment might provide a remedy.